Receipt number AUSFCC-11527127

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

TIDEWATER, INC.,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

Case No. 26-1580 C

## COMPLAINT

Pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–7109, Plaintiff Tidewater, Inc. ("Plaintiff" or "Tidewater") files this Complaint against the United States, acting by and through the U.S. State Department, Bureau of Overseas Building Operations ("OBO" or the "Government"), appealing OBO's unjustified default termination of Tidewater's Task Order No. 19AQMM24F0551. This Complaint seeks conversion of the default termination into a termination for the Government's convenience pursuant to FAR 52.249-10(c) and further seeks a total of $270,180.00 in damages from OBO in addition to a 224-calendar-day compensable time extension.

## PARTIES

1. Plaintiff Tidewater is a Maryland corporation and federal government contractor with its principal place of business at 6625 Selnick Drive, Suite A, Elkridge, Maryland 21075-6220.

2. Defendant is the United States, acting by and through the U.S. State Department, Bureau of Overseas Building Operations.

## JURISDICTION

3. On June 24, 2022, OBO awarded Tidewater indefinite-delivery, indefinite quantity ("IDIQ") Contract No. 19AQMM22D0058 for design-build construction projects at various State Department posts and other facilities worldwide. In August 2024, OBO awarded Tidewater Task Order No. 19AQMM24F0551 under the IDIQ Contract. The IDIQ Contract and Task Order are subject to the CDA.

4. On October 31, 2025, the Contracting Officer issued a final decision terminating the Task Order for default pursuant to "FAR 49.402-3 and the contract's Default clause[.]" (**Exhibit 1**, Default Termination.) *See* 41 U.S.C. § 7103(a)(3). The default termination alleges "Tidewater failed to cure its performance deficiencies within the time permitted and failed to provide required deliverables necessary to proceed into design." (Ex. 1 at 1.)

5. On April 7, 2026, Tidewater submitted to the Contracting Officer a certified claim asserting affirmative relief. (**Exhibit 2**, Tidewater Certified Claim.) Tidewater's certified claim seeks: (1) conversion of the default termination into a termination for the government's convenience; (2) $270,180.00, comprising Tidewater's outstanding invoices for work performed ($207,890.00) and its general conditions and unabsorbed home office overhead ($62,290.00); and (3) a time extension of 224 calendar days. (*See generally id.*)

6. On September 23, 2026, after two time extensions, the Contracting Officer issued his final decision denying Tidewater's certified claim in its entirety. (**Exhibit 3**, COFD.) The Contracting Officer denied each portion of Tidewater's claim for monetary relief, denied Tidewater's claim for a 224-day time extension, and asserted that OBO's decision to terminate the Task Order was proper.

7. Tidewater now files this Complaint appealing the Contracting Officer's final decision purporting to terminate the Task Order for default and the Contracting Officer's denial of

Tidewater's certified claim. This Complaint is timely filed within 12 months from October 31, 2025 (the date of receipt from the Contracting Officer's termination decision) and within 12 months from September 23, 2026 (the date of the Contracting Officer's denial of Tidewater's affirmative claim). *See* 41 U.S.C. § 7104(b)(3).

8. Thus, this Court has jurisdiction over Tidewater's timely appeal of the Contracting Officer's unjustified default termination and denial of its affirmative claim under the Tucker Act, 28 U.S.C. § 1491(a), and the CDA, 41 U.S.C. § 7104(b)(1).

## FACTUAL BACKGROUND

### I. THE ANTANANARIVO CHILLER PROJECT TASK ORDER RFP

9. On February 9, 2024, OBO issued a request for proposals under the IDIQ Contract for the design and construction of a chiller plant replacement system at the U.S. embassy in Antananarivo, Madagascar.

10. The project required replacement of two existing chillers located on the roof of an existing building with two chillers meeting OBO's specifications and requirements. The awarded task order was to be firm fixed price.

#### A. Basis of Design

11. Included with the request for proposals was OBO's Basis of Design ("BOD") Commentary. Per the BOD Commentary, OBO was not specifying a particular chiller; rather, OBO was supplying offerors with its specifications and requirements for the chillers.

12. To "help [expedite] an understanding" of OBO's chiller requirements, OBO shared "important considerations" with offerors, including:

> 1) . . . . The contractor base bid pricing shall be based on the capacity (tonnage) of existing equipment as installed currently onsite. Deviations discovered during design as related to the size / selection

> of the chillers, etc will be negotiated as a modification to the contract . . .
>
> 2) Chiller condensers heat exchanges shall be copper tubes with copper fins . . .
>
> 3) Microchannel condensers will not be accepted.

**B. Statement of Work**

*Section 1.3.1.2 New Chilled Water System Description*

13. The BOD Commentary was consistent with the Statement of Work ("SOW"), which specified OBO's requirements for the chillers (section 1.3.1.2). The contractor was to provide "two (2) screw air-cooled chillers minimum of 185 tons (651.8kW) each." The chillers were to be located on the "Chancery roof next to the mechanical penthouse." The chillers' requirements included:

> 1.Condenser to be Copper Tubes with Copper Fins & ECoating
>
> * * * *
>
> 8. Refrigerant circuit with initial charge of R-1234ZE refrigerant, meeting performance requirements of ASHRAE Standard 90.1 for efficiency
>
> 9. MicroTech IV controller

14. The SOW also specified that a "licensed Structural and Seismic Engineer" was to "review the existing structural documentation and confirm the new load capacity is adequate for the weights of the new mechanical equipment." (*Id.* at 6.)

*Section 4.3.1 Design Engineering Site Survey / Calculations / Report*

15. The SOW required the contractor to conduct a site survey and provide a report on the contractor's structural inspections and analysis. Specifically:

> Structural inspections / analysis for only areas in scope. Survey existing structural conditions (design loading and facility

> conditions). Commentary on deviations from basis of design including existing structure's ability to support new equipment (e.g., chillers, pumps, etc.). This deliverable shall address the existing structure's ability to support (or not support) new equipment. If major structural modifications are required, that shall be negotiated as a contract modification. Major structural modifications are defined as work outside typical concrete pad resizing, typical dunnage / vibration isolation sizing, etc.

16. Thus, inspections would include verification of existing site conditions and review of the available as built drawings but would not have included destructive testing such as coring the concrete pad.

*Section 4.3.1.2 Concept Development / Discussions Support*

17. The BOD Commentary also noted that the contractor would owe "concept development / discussions support," as required by section 4.3.1.2 of the SOW. This was to include "research into multiple chiller options to help find the best fit, ***which is a juggling action*** in analyzing weight, power draw, tonnage, physical size, etc." (emphasis added). OBO went on to note, "***Obviously***, increasing the size of an existing chiller plant on the roof of a building includes challenges."

18. Thus, "OBO desires to fully understand the maximum size chillers that could economically be installed, but responsibility maximizing weight, space, amp draw, physical size, etc." This entails a side-by-side comparison of chillers, "But as mentioned above... New equipment as part of the original base bid shall be priced as capacities to match existing, ***and any changes in capacity will be discussed / negotiated as a contract modification***."

19. This requirement was embodied in the SOW at section 4.3.1.2:

> 4.3.1.2 Concept Development / Discussions Support: It is excepted that new equipment physical sizes, amp drawings, etc. shall slightly differ from existing. It is expected that lead times may differ between equipment manufacturers. It is also expected that some

> tasks in the contract may have various solutions to achieve the same goal, which could include execution options and/or cost savings. Where these grey areas exist, the Contractor shall support discussions with OBO, develop sketches, calculations, research with vendors, etc. For example, this deliverable is expected this include, but is not limited to:
>
> 4.3.1.2.1 Researching / discussions related to considering various chiller manufacturers for the New Chancery NOB chillers, which at a minimum should include Trane, York/JCI, Daikin.

**C. Project Scheduling**

20. The Task Order incorporates specification section 013205, Project Scheduling, which requires development of a "detailed Project Execution Schedule" ("PES") to include tasks and milestones representing the scope of work. The PES was to be "cost-loaded" (*i.e.*, include the Schedule of Values ("SOV")).

> 1.05 SCHEDULE DEVELOPMENT
>
> A. The detailed Project Execution Schedule (PES) will include tasks and milestones representing the entire Contract Scope of Work.
>
> B. The PES shall be cost-loaded. The Total Baseline Cost of the PES shall coincide with the Total Contract Amount excluding VATs.
>
> C. Required Milestones – those below must appear; additional milestones by Contractor or PD/COR may be added
>
> 1. Contract Award
>
> 2. NTP-Construction
>
> 3. Required Dates for delivery of USG furnished items (GFCI).
>
> 4. Project Substantial Completion
>
> 5. Final Acceptance

D. Provide sufficient detail to show a logical Critical Path beginning with the first schedule activity and ending with the final schedule activity.

E. All activities, except first and last, shall have at least one predecessor and once successor relationship link.

## II. PERFORMANCE

21. OBO awarded Tidewater the firm fixed price Task Order in August 2024.

### A. Design

*Site Survey Report*

22. On March 13, Tidewater provided OBO with a site survey report per SOW section 4.3.1. Included in the report was Tidewater's chiller recommendation (vendor make and model): the Daikin 170 ton chiller. As part of the report, Tidewater explained that, although the SOW required replacing the existing 160 ton (564.83 kW) chillers with 185 ton (650 kW) chillers, the electrical load could not be supported by the building. The design team considered what changes would be required to increase the building's electrical capacity to support the desired 185 ton chillers but ultimately determined this was not feasible.

23. In an effort to arrive at a workable solution, Tidewater's design team discussed with the Facilities Staff their existing needs. The Facilities Staff informed Tidewater that they were operating "two out of the four current chiller compressors at a time to satisfy the building load"—meaning, the Facilities Staff needed chillers providing some additional capacity. The Daikin 170 ton chiller, ultimately proposed by Tidewater, would provide the building with additional capacity beyond the existing 160 ton chillers.

24. Tidewater's site survey report also analyzed the structural elements. Based on the government's drawings, the mechanical pad was to extend 400MM above the roof topping slab. The roof was a flat roof with a concrete slope, so the additional weight of the sloping concrete

(306MM) needed to be factored in. Thus, the basis of design concrete was to be approximately 706MM (306MM + 400MM). However, during the survey, it was determined that the pad extended 515MM above the sloped roof, not 400MM. These measurements, when added to the existing slope, yielded a determination that the concrete was at least 821MM (306MM for the roof + 515MM for the pad).

25. Importantly, Tidewater's structural analysis also assessed the existing roof structure's capacity for supporting the existing chiller loads. Tidewater determined that the existing roof capacity was insufficient for support of both the new chiller loads and for the existing chiller loads when resting directly on the existing concrete pads.

26. Ultimately, Tidewater proposed the Daikin 170 ton, which would use the specified MicroTech 4 controller (a controller unique to Daiken) and R1234ze refrigerant, along with the required structural changes (a new steel grillage platform).

*Request for Information*

27. On March 21, 2025, Tidewater submitted a request for information ("RFI") to OBO requesting direction. Tidewater's structural engineer determined that the existing building's structure / roof did not have the capacity to support OBO's desired chiller equipment (as specified in the SOW). Thus, if OBO wanted chillers meeting the requirements specified in the SOW, the parties would have to agree to "major structural modifications."

28. Further, the designer also performed a preliminary evaluation of the structural loads of the existing copper chiller and a microchannel version of the chiller (which is lighter than the copper version). Tidewater determined, "It is possible that a different manufacturer produces a chiller that will work but it most likely will not meet the requirements of 1.3.1.2 of the SOW and will require contract modification."

29. Tidewater requested direction from OBO on next steps—did OBO wish to revise its requirements for the new chiller equipment? Or did OBO wish to maintain its requirements for the chillers but proceed with "major structural modifications"?

30. OBO responded on March 31, requesting further supporting documentation from Tidewater, which Tidewater promptly provided on April 3, 2025.

31. OBO, however, failed to provide the needed direction.

32. As such, Tidewater's work under the Task Order effectively came to a standstill.

**B. Schedule of Values**

33. At the same time Tidewater's designers were attempting to work with OBO on the design, Tidewater submitted its Project Execution Schedule, to include the cost loaded portion or "Schedule of Values" ("SOV") as required by section 013205 of the Task Order, to the Contracting Officer's Technical Representative ("COTR"). Tidewater submitted the deliverable on March 7.

34. On March 20, the COTR rejected Tidewater's SOV. In rejecting the SOV, the COTR requested that Tidewater backload the SOV—that is, shift Tidewater's costs to the end of the task order, despite the requirements stating the SOV was to be cost loaded. ("The PES ***shall be cost-loaded***.") The COTR listed "examples" of "major issues" he had with Tidewater's SOV: "The [SOV] needs to be tied to deliverables."; "Final acceptance is not a zero-dollar item."; "Commissioning is not 0.39% of the project."

35. The COTR's basis for rejection ignored the reality that most of Tidewater's performance costs (as identified in its proposal) were to be incurred early on. Further, none of the COTR's "major issues" related to any requirement in the Task Order or underlying IDIQ Contract.

36. Nonetheless, despite disagreeing with the COTR's basis for rejection, Tidewater submitted a revised SOV on April 4. On April 10, the COTR indicated that it would reject Tidewater's revised SOV. Even so, the COTR directed Tidewater to upload the revised SOV to

ProjNet. The COTR's response to Tidewater's revised SOV again requested that Tidewater add elements to the submittal that were neither required by the Task Order or underlying IDIQ, nor included in Tidewater's proposal submission.

37. In an effort to move things forward (and get paid for the bonds as well as performing the site survey and delivering the site survey report) Tidewater provided yet another SOV on April 16. This SOV included a full breakdown of Tidewater's proposal, including overhead and profit, as requested by OBO. The COTR did not respond, prompting Tidewater to request a meeting on May 13. That same day, the COTR rejected Tidewater's revised SOV—this time, without comment. OBO never responded to Tidewater's request for a meeting.

38. On May 22, however, the COTR came back with ***even more*** requirements for the SOV—beyond those in his March and April emails (and, again, beyond those required by the IDIQ Contract and Task Order). Feeling the parties had reached an impasse, Tidewater requested direction from the Contracting Officer.

39. On June 10, the Contracting Officer responded. "To move [the] matter forward and avoid further delay," the contracting officer made the following "determinations":

> - Your current SOV is not accepted as compliant due to insufficient breakdown of costs and unclear association with project tasks and milestones.
>
> - The Government will accept a revised SOV that meets the following minimum expectations:
>
> • Discrete tasks no greater than 5% of total contract value unless justified in writing;
>
> • Labor, equipment, and materials segregated and assigned proportionally to the relevant activities;
>
> • All startup costs (mobilization, badging, logistics) broken down by subcomponents and accompanied by cost rationale;

> • Grouped line items (e.g., "etc.") disaggregated with full itemization;
>
> • Clear crosswalk between the SOV and your original cost proposal.
>
> The Government agrees to consider progress payments for properly documented material in bonded storage (per FAR 52.232-5(b)), provided sufficient evidence of ownership, intended use, and security is submitted and verified.
>
> Upon receipt of a compliant SOV, the Government will expedite review and payment for valid, accepted work performed to date, including pending items like site surveys.

40. On June 17, Tidewater submitted a full and complete revised SOV that complied with the contracting officer's June 10 direction. OBO never responded to Tidewater's June 17 SOV submission.

### C. Cure Notice

41. As of August 5, 2025, over four months after Tidewater submitted the RFI requesting direction from OBO on how to proceed and supplied the requested supporting documentation, OBO still had not provided Tidewater with direction. Yet, inexplicably, the Contracting Officer issued Tidewater a cure notice, claiming the project was "seven (7) months" behind schedule. The cure notice is even more incredulous considering the Contracting Officer failed to ever issue a notice to proceed.

42. The cure notice requested Tidewater take "corrective action" with respect to the following: (1) submit a revised site survey report; (2) comply with "Contractual Payment Terms"; and (3) improve project management oversight.

43. The cure notice alleged "[m]ultiple deficiencies" including "[i]ncomplete structural and mechanical assessments" and "[f]ailure to provide a corrected and complete" site survey report. The cure notice also stated that Tidewater's "attempts to request payment" in accordance

with its SOV were "outside the terms of the contract." Finally, the cure notice directed Tidewater to "improve project management oversight" by assigning "a qualified and dedicated project manager who can meet all reporting, schedule, and quality requirements under the contract."

44. OBO's notice stated that failure to "cure these deficiencies" within ten calendar days may result in the withholding of progress payments (FAR 52.232-5(e)),[1] issuance of a show cause notice, or termination for default under FAR 49.402-3.

45. Tidewater promptly responded. In its response, Tidewater highlighted OBO's own language from the BOD Commentary and SOW, which expressly acknowledged the potential existence of "grey areas" during concept development and the required collaboration between the contractor and OBO. Tidewater's site survey report was not "incomplete"—it simply exposed a reality OBO apparently did not want to deal with: that the capacity of the existing structure could not support two 185 ton chillers.[2]

46. Regarding contract payment and the SOV, Tidewater referenced the contracting officer's June 10 direction, which specified OBO's "minimum expectations" for accepting a revised SOV. Tidewater complied with this direction, to include providing OBO with a complete breakdown of project costs. Incredibly, the cure notice ***contradicted*** the contracting officer's June 10 direction regarding the SOV.

[1] OBO had not (and still has not) paid Tidewater anything under the task order, including the bonds.

[2] A reality that OBO was nonetheless aware of (or at least had anticipated): "[The site survey report] deliverable shall address the existing structure's ability to support ***(or not support)*** new equipment." (SOW Section 4.3.1.1.1 (emphasis added).)

47. Finally, regarding the project manager, OBO had no basis to require removal. OBO, not Tidewater, was responsible for the delays in the design / concept development, as well as in approving an SOV.

**D. Show Cause**

48. On September 30, 2025, OBO issued Tidewater a show cause letter, declaring "deficiencies remain uncured and performance does not demonstrate a credible path to cure." The letter stated the "unresolved deficiencies include, but are not limited to":

> • Site Survey Report / Concept Development (SOW §4.3.1.2): Failure to provide tangible solutions and viable design options with supporting calculations and sketches; continued emphasis on structural concerns while seeking to shift liability to the Government.
>
> • Schedule of Values (FAR 52.232-5(b)): Failure to provide an SOV aligned with progress payments for work accomplished; requests for early payment for equipment prior to installation, start-up, and acceptance are not compliant.
>
> • Project Management Oversight: Failure to assign and empower a qualified, dedicated project manager and to implement corrective measures that restore schedule discipline and responsiveness.

49. Tidewater responded on October 10. Tidewater reiterated its position that it had:

- Provided a complete, revised site survey report as far as it can be taken without direction or guidance from OBO (*i.e.*, a response to Tidewater's March 21 RFI or otherwise a modification to the task order).
- Submitted a detailed, compliant SOV that met the contracting officer's "minimum requirements" as specified in its June 17 letter.
- Provided a qualified, day-to-day project manager.

50. Additionally, regarding the project manager, Tidewater noted that it "would be open to replacing him," but that "any replacement cannot change the facts" that OBO had not

provided Tidewater with the necessary direction requested in its March 2025 RFI or approved Tidewater's SOV.

**E. Default Termination**

51. On October 31, OBO purported to terminate the task order for default. The default termination states, "Pursuant to FAR 49.402-3 and the contract's Default clause, the Contracting Officer determines that Tidewater failed to cure its performance deficiencies within the time permitted and failed to provide required deliverables necessary to proceed into design."

52. On April 7, 2026, Tidewater submitted to the Contracting Officer its affirmative claim for relief, seeking (1) conversion of the default termination into a termination for the government's convenience; (2) $270,180.00, comprising Tidewater's outstanding invoices for work performed ($207,890.00) and its general conditions and unabsorbed home office overhead ($62,290.00) for the extended delay / suspension period caused by OBO; and (3) a time extension of 224 calendar days. (*See* Ex. 2.)

**F. Contracting Officer's Final Decision**

53. On September 22, 2026, the Contracting Officer issued his final decision denying Tidewater's certified claim in its entirety. (*See* Ex. 3.)

54. With respect to Tidewater's monetary claim for work performed ($207,890.00), the Contracting Officer asserted that Tidewater's claim failed to establish that the invoiced amount "represents work accomplished" / "work that met the contract's standards of quality." (*Id.* at 3.)

55. The Contracting Officer maintained that OBO's prior rejections of Tidewater's Site Survey Report, concept development, and SOV were proper and claimed that because Tidewater "did not segregate the $207,890 into discrete, verifiable components" the Contracting Officer could not determine "what lesser amount, if any, was payable under FAR 52.232-5(b)." (*Id.* at 10.)

56. With respect to Tidewater's claim for delay damages ($62,290.00), the Contracting Officer stated the obvious: "Tidewater's calculation assumes that the entire 224-day period . . . was a compensable Government suspension." (*Id.* at 11.) The Contracting Officer took issue with Tidewater's delay calculation, stating that it "does not segregate any particular Government review period, demonstrate its effect on the critical path, or account for concurrent delay." (*Id.* at 12.)

57. Lastly, the Contracting Officer noted that OBO's October 31, 2025, Default Termination constituted the Contracting Officer's final decision with respect to the termination, and, "[w]ithout reopening that Final Decision," the Contracting Officer reiterated that the Default Termination was proper. (*Id.* at 12.)

58. Tidewater now files this complaint, appealing the Contracting Officer's final decision purporting to terminate the Task Order for default and the Contracting Officer's denial of Tidewater's April 2026 certified claim.

## **COUNT I**

Unjustified Default Termination

*(Conversion of the Default Termination into a Termination for the Government's Convenience)*

59. Tidewater realleges and incorporates by reference the paragraphs set forth above.

60. Tidewater is entitled to conversion of the default termination into one for the government's convenience because OBO lacked justification for the termination decision.

61. Termination for default is "a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir.1987) (internal citation omitted). The test for whether the government justifiably terminated a contractor for default, based on failure to make progress, is whether the contracting officer had a reasonable belief "that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract

performance." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016 (Fed. Cir. 2003) (quoting *Lisbon*, 828 F.2d at 765–66).

62. Further, it must be clear that the termination decision was based on "tangible, direct evidence reflecting the impairment of timely completion." *Id.*; *see also PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 808 (2000) ("The government may not use default as a pretext for terminating a contract for reasons unrelated to performance; instead, there must be a nexus between the government's decision to terminate for default and the contractor's performance.").

63. The default clause governing the task order is FAR 52.249-10, Default (Fixed-Price Construction), which states:

> If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

FAR 52.249-10(a).

64. FAR 49.402-3 governs the process for and considerations involved in a termination for default decision, including the factors to be considered by the contracting officer. *See* FAR 49.402-3(f) (listing factors, including the "terms of the contract"; the "specific failure of the contractor and the excuses for the failure"; any other "pertinent facts and circumstances"); *see also Alutiiq Mfg. Contractors, LLC v. United States*, 143 Fed. Cl. 689, 697–99 (2019) (failure to consider FAR 49.402-3 factors rendered default termination improper); *Schneider Elec. Buildings Americas, Inc. v. United States*, 163 Fed. Cl. 708, 719 (2023) (overturning default termination where contracting officer's decision was not "directly relate[d] to the stated 'terms of the contract'" per FAR 49.402-3(f)(1)).

65. Here, it is evident that the Contracting Officer failed to conform to the FAR and applicable case law in making his termination decision, rendering the decision improper. As described at length in the parties' correspondence, no chillers exist that could both meet OBO's requirements (as specified in the BOD and SOW) and sit atop the existing structure (without major structural modifications). This was a reality that OBO acknowledged and accounted for when issuing the RFP. For example:

- "Deviations discovered during design as related to the size / selection of the chillers, etc will be negotiated as a modification to the contract."
- Noting the survey site report was to include commentary "on deviations from basis of design including existing structure's ability to support new equipment (e.g., chillers, pumps, etc. . . . . (or not support) new equipment." And, "If major structural modifications are required, that shall be negotiated as a contract modification."
- "Obviously, increasing the size of an existing chiller plant on the roof of a building includes challenges."
- Noting where "grey areas exist" in terms of equipment physical sizes, lead times between equipment manufacturers, and tasks that "may have various solutions to achieve the same goal," the contractor was to work with OBO.

66. Despite acknowledging the likelihood of "challenges" and "grey areas" in performance, OBO refused to modify its requirements for the chillers, authorize further investigation and testing of the identified structural issues, or otherwise provide substantive direction in response to Tidewater's request for information.

67. In this regard, it is evident the Contracting Officer failed to consider the "terms of the contract"; the "specific [alleged] failure of the contractor and the excuses for the [alleged] failure"; "the availability of the supplies or services from other sources"; and "any other pertinent facts and circumstances." FAR 49.402-3(f)(1), (2), (3) & (7).

68. OBO's default termination states that Tidewater failed to provide "(i) a complete revised Site Survey Report with fully developed concept alternatives and supporting calculations;

(ii) a compliant Schedule of Values aligned to FAR 52.232-5; and (iii) designation of a qualified day-to-day project manager and a corrective action plan with dated recovery milestones."

69. According to OBO, "Tidewater failed to cure [these] performance deficiencies within the time permitted and failed to provide required deliverables necessary to proceed into design. [These] failures are not excusable."

70. OBO's default termination is not rooted in "tangible, direct evidence," *McDonnell*, 323 F.3d 1006 at 1016, demonstrating a "clear violation of contract terms." *Keeter Trading Co., Inc. v. United States*, 76 Fed. Cl. 243, 253–54 (2007).

71. OBO does not (and cannot) show that Tidewater's site survey report failed to comply with SOW section 4.3.1 or that its SOV did not meet the required criteria specified in task order section 013205. Nor has OBO even attempted to tie its objections to Tidewater's project manager to the Task Order requirements.

72. Because the default termination lacks a "close nexus to a 'clear violation'" of the Task Order's terms, *see, e.g.*, *Schneider Elec.*, 163 Fed. Cl. 708 at 718–19, it was improper. As such, Tidewater is entitled to conversion of the default termination into one for the Government's convenience.

## COUNT II

OBO was the Sole and Proximate Cause of All Performance Delays

*(Conversion of the Default Termination & Entitlement to a Compensable Time Extension)*

73. Tidewater realleges and incorporates by reference the paragraphs set forth above.

74. Even if Tidewater was in default (which it was not) any such default was excusable (and compensable) because OBO's actions were the primary and sole cause of any performance delays.

75. The Task Order's default clause, FAR 52.249-10, allows a contractor to avoid termination based on contract delays if such delays arise from "unforeseeable causes beyond the control" of the contractor, such as "acts of the Government in either its sovereign or contractual capacity." FAR 52.249-10(b). Indeed, a contractor can show that the default was excusable by, for example, "showing that improper government actions were the primary or controlling cause of the default[.]" *Keeter Trading Co.*, 76 Fed. Cl. 243 at 253–54.

76. Here, Tidewater requested direction from OBO on how to proceed—did OBO wish to revise its requirements for the new chiller equipment or did OBO wish to maintain its requirements but proceed with "major structural modifications"—and OBO failed to provide timely direction.

77. Tidewater could not continue performance without direction from OBO. OBO's failure to provide Tidewater with substantive, timely direction constitutes an "act of the Government" in its contractual capacity, which delayed (indeed, suspended) Tidewater's performance. This renders any "default" excusable and entitles Tidewater to conversion of the default termination into one for the Government's convenience.

78. The same is true regarding the SOV. Tidewater, on multiple occasions, attempted to submit an SOV meeting OBO's exacting (and out of scope) requirements. Even after the Contracting Officer provided Tidewater with his "minimum expectations" for the submittal, OBO still failed to issue its approval. OBO's failure to timely approve the SOV constitutes an "act of the Government" in its contractual capacity, which suspended Tidewater's performance. This too renders any "default" excusable.

79. OBO effectively suspended Tidewater's performance beginning on March 21, 2025 (the date Tidewater submitted its RFI to OBO requesting direction on how to proceed) through

October 31, 2025 (the date of the purported termination). Tidewater's performance remained suspended because, as of the date of the termination, OBO still had not provided direction to Tidewater on how to proceed. Because OBO is responsible for suspending Tidewater's work from March 21, 2025 through October 31, 2025 a period of 224 calendar days, Tidewater is entitled to a 224-calendar day compensable time extension and conversion of the default termination.

**COUNT III**

OBO Committed Prior Material Breaches

*(Conversion of the Default Termination & Entitlement to Payment on Outstanding Invoices)*

80. Tidewater realleges and incorporates by reference the paragraphs set forth above.

81. The default termination is improper because OBO committed prior material breaches of the Task Order. Specifically, OBO materially breached the task order by (1) failing to provide direction regarding the design; (2) failing to approve the SOV; and (3) failing to make any payments to Tidewater for work performed.

82. "If a contractor can establish that the United States materially breached the contract, the contractor's failure to perform may be excused and a termination for default converted to a termination for convenience." *Schneider Elec. Buildings Americas, Inc. v. United States*, 163 Fed. Cl. 708, 720 (2023) (citing *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1276 (Fed. Cir. 1999)).

83. Such prior material breaches render any alleged failures or nonperformance on Tidewater's part excusable, entitling Tidewater to conversion of the default termination into one for the Government's convenience; and payment of $207,890.00 for work performed under the task order for which OBO has not yet paid.

*(1) Failure to Provide Direction Regarding the Design*

84. Tidewater provided OBO with its revised site survey report, as required by SOW section 4.3.1 on March 13, 2025. The site survey report complied with the SOW. It included a structural analysis for the areas within the Task Order's scope of work (*i.e.*, the existing structure) and provided commentary on deviations from the basis of design—including the existing structure's ability to "not support" the specified new equipment.

85. Tidewater presented viable options to OBO in its March 21 RFI: proceed with procuring chillers that meet OBO's specifications in SOW section 1.3.1.2 and authorize "major structural modifications" or revise the requirements for the chillers. OBO never provided direction on how to proceed.

86. This failure constitutes a breach of the implied duty of good faith and fair dealing, a duty which is inherent in every contract, including those with the government. *See Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990–91 (Fed. Cir. 2014).

87. "When some government action is essential for the contractor to perform and the government wrongfully fails or refuses to take that action, then the government has breached its implied duty to cooperate." *Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184, 192 (2002); *see also Relyant, LLC*, ASBCA No. 59809, June 27, 2018, 18-1 BCA ¶ 37085 (holding government's failure to act in a timelier manner in responding to contractor's requests constituted a breach of the implied duty of good faith and fair dealing).

88. Here, Tidewater's continued performance depended upon OBO's direction. Tidewater requested such direction on March 21, March 31, and again on April 3. OBO never provided the requested direction. Then, OBO terminated the Task Order for default. OBO's actions constitute a breach of the implied duty to cooperate, rendering its termination of the Task

Order improper and requiring conversion of the termination into one for the Government's convenience.

*(2) Failure to Approve the SOV*

89. OBO also breached the Task Order when it imposed additional requirements on Tidewater's SOV, above and beyond what the Task Order required, and then still failed to approve the SOV, even after Tidewater included all requested details / breakdowns.

90. As with OBO's failure to provide direction regarding the design, OBO's failure to approve Tidewater's compliant and detailed SOV constitutes a breach of the implied duty of good faith and fair dealing; specifically, the implied duty to cooperate. *See, e.g.*, *Ryco Constr., Inc.*, 55 Fed. Cl. 184 at 192.

91. Accordingly, OBO's default termination was improper, and Tidewater is entitled to conversion from a default termination into one for the Government's convenience.

*(3) Failure to Make Payments*

92. Finally, to date, OBO has not paid Tidewater anything for its work under the Task Order, including for payment and performance bonds.

93. Failure to make progress payments when due can give rise to a material breach. *See, e.g.*, *Morganti Nat., Inc. v. United States*, 49 Fed. Cl. 110, 141 (2001), aff'd, 36 F. App'x 452 (Fed. Cir. 2002). Materiality is shown by the totality of the circumstances, including "the amount of money involved, the length of time of the non-payment, and the payment procedure agreed to by the parties[.]" *Id.*; *see also Northern Helex Co. v. United States*, 197 Ct. Cl. 118, 124–25 (1972) (noting a "clear distinction" between mere delay in payment and "a total failure to pay over many months" with the latter being the sort of breach by the government that is "material").

94. Here, it is undisputed that OBO has not paid Tidewater a single cent for its work under the Task Order to date. Tidewater performed from August 2024 through the date of the

termination (October 31, 2025). Tidewater provided the required bonds, performed the site survey, and delivered the site survey report to the government.

95. Yet, OBO has continually and repeatedly failed to approve any invoices from Tidewater. OBO owes Tidewater $207,890.00 for work performed.

96. OBO's failure to make any payments unquestionably constitutes a material breach of the parties' agreement. Because OBO materially breached the Task Order prior to terminating Tidewater for default, any alleged "default" should be excused and the default termination converted to a termination for convenience. *See Schneider Elec. Buildings*, 163 Fed. Cl. 708 at 720.

**COUNT IV**

OBO Breached the Task Order

*(OBO Failed to Grant Tidewater an Equitable Adjustment)*

97. Tidewater realleges and incorporates by reference the paragraphs set forth above.

98. The Task Order is a valid and enforceable contract.

99. Tidewater performed work under the Task Order in accordance with the Task Order and Contract's specifications until OBO unjustifiably terminated Tidewater for default.

100. OBO was obligated to pay Tidewater for the work Tidewater performed.

101. OBO also delayed and actually and/or constructively suspended Tidewater's performance under the Task Order.

102. OBO was obligated to pay Tidewater delay damages and issue a time extension based on its delay and actual and/or constructive suspension.

103. OBO breached the Task Order by refusing to issue Tidewater an equitable adjustment in response to Tidewater's presentment of a certified claim for time and money to which Tidewater is entitled.

104. As a result of OBO's breach, Tidewater has suffered damages totaling at least $270,180.00.

105. Tidewater is entitled to $270,180.00 in payment from OBO and a 224-day extension to the Task Order.

**PRAYER FOR RELIEF**

THEREFORE, Plaintiff requests that this Court:

1. Declare that OBO wrongfully terminated the Task Order for default;

2. Order the termination for default be converted to a termination for convenience;

3. Declare that OBO's failure to provide the necessary direction to Tidewater and failure to timely approve the SOV were "acts of the Government" in its contractual capacity under FAR 52.249-10;

4. Award Tidewater a 224-calendar day time extension and $62,290.00 in delay damages attributable to OBO's unreasonable and unjustified suspension of Tidewater's work;

5. Declare that OBO materially breached the Task Order by failing to provide direction regarding the design; failing to approve the SOV; and failing to remit any payment for work performed;

6. Award Tidewater to $207,890.00 plus prompt payment interest for work performed under the Task Order for which OBO has not paid; and

7. Grant such other and further relief as the Court deems just and proper.

Dated: October 20, 2026

Respectfully submitted,

**BURR & FORMAN LLP**

s/ Sean Milani-nia by s/ Kelsey Hayes
P. Sean Milani-nia (Attorney of Record)
Kelsey M. Hayes

Michael J. Brewer
99 M Street SE, Suite 900
Washington, D.C., 20003
Phone: (771) 232-1699
E-mail: smilani@burr.com

*Counsel for Tidewater, Inc.*